# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3321-19
　　　　　　　　A-3394-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

　　　　Plaintiff-Respondent,

v.

T.A.C. and T.M., Sr.,

　　　　Defendants-Appellants,

and

R.B. and THE BIOLOGICAL
FATHER OF A-J.D.C.,
WHOMSOEVER HE MAY BE,

　　　　Defendants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A-J.D.C.
and T.M., Jr., minors.

_____

Submitted March 10, 2021 – Decided June 3, 2021

Before Judges Ostrer, Accurso, and Vernoia.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0142-19.

Joseph E. Krakora, Public Defender, attorney for appellant T.M., Sr. (Sarah L. Monaghan, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant T.A.C. (Lauren Derasmo, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Julie B. Colonna, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Rachel E. Seidman, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendants T.A.C. (Teresa) and T.M., Sr. (Thomas) appeal from the Family Part's April 6, 2020 judgment that terminated their parental rights to their son, T.M., Jr. (Tommy), born December 18, 2016, and terminated Teresa's

A-3321-19

parental rights to her son A.-J.D.C. (Andrew), born January 17, 2016.[1] The children have been in placement since May 2017.

Both parents contend the Division failed to present sufficient credible evidence to support the trial court's clear and convincing finding that the Division met the four prongs of the best interests standard. N.J.S.A. 30:4C-15.1(a). Teresa and Thomas also assert procedural and evidentiary errors. The Law Guardians for the two children join the Division of Child Protection and Permanency in opposing the appeal. We conclude, after reviewing the record in light of the parents' arguments, that the trial court correctly applied the governing legal principles, and sufficient credible evidence supports the court's findings. Therefore, we affirm.

I.

The Division presented its case through the testimony of adoption case worker Latoya Nannan, and a psychological expert, Elizabeth Stilwell, Psy.D. Nannan recounted reported incidents of domestic violence assault by Thomas against Teresa; Teresa's mental health issues; the parents' compliance and non-compliance with visitation and services; the parents' housing instability; the

---

[1] Andrew's putative father, who resided out-of-state, was never served, despite repeated attempts. Also, we use pseudonyms for the parties and the children because their names are excluded from public access by Rule 1:38-3(d)(12).

A-3321-19

Division's efforts to explore family placement; and the children's adjustment to their resource parents. Dr. Stilwell evaluated Teresa and performed bonding evaluations of Andrew with Teresa and his resource parent. But, she was unable to evaluate Thomas, because he failed to attend scheduled meetings with Dr. Stilwell. Dr. Stilwell testified that Teresa was unable to appropriately parent her children. Andrew had bonded with his resource parent. And terminating the parties' parental rights would not do more harm than good. The court also admitted into evidence voluminous Division records, subject to specific redactions requested mainly by Teresa's counsel. Teresa and Thomas did not testify, nor did they present any witnesses.

Based on this record, Judge Wayne J. Forrest found, in a comprehensive written opinion, that the Division showed, by clear and convincing evidence, that:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

4

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

The court found Nannan and Dr. Stilwell were both credible.

To support its finding that the children's "safety, health or development has been or will continue to be endangered by the parental relationship," N.J.S.A. 30:4C-15.1(a)(1), the court noted that Tommy and Andrew were present during at least three domestic violence incidents, and Andrew was physically injured during one of them. Teresa obtained two temporary restraining orders against Thomas, who failed to complete an ordered batterer's intervention program. The court also relied on Dr. Stilwell's opinion that Teresa struggled with depression and lacked an understanding of its impact on her children, which impaired her ability to parent successfully. The court also noted neither parent had been able to achieve stable housing throughout the litigation, and Teresa was unable to provide proof of employment.

A-3321-19

As for prong two, the court found that both parents were "unwilling or unable to eliminate the harm facing" Tommy and Andrew; they were "unable or unwilling to provide a safe and stable home" for them; and "the delay of permanent placement [would] add to the harm." N.J.S.A. 30:4C-15.1(a)(2). The court noted both parents' inability to complete court-ordered and Division-offered services. Neither parent was able to provide a stable home for the children. Relying on Dr. Stilwell's testimony, Judge Forrest also found the harm facing Andrew included "evidence that separating [him] . . . from his resource family parents would cause [him] serious and enduring emotional or psychological harm." Ibid.

Applying prong three, the court found the Division "made reasonable efforts to provide services to help the parent[s] correct the circumstances which led to the child's placement outside the home." The court listed the services offered:

> psychological evaluations along with recommendations; psychiatric referrals; medication monitoring; consultations with domestic violence liaisons; batterer's intervention programs; individual counseling; supervised visitation, both in New Jersey and in North Carolina; transportation assistance; referrals for parenting, parent-aides, Family Preservation Services and Essex County Pregnancy and Parenting classes; placement for the two children and the payment of the board rate; Medicaid; Early

6

Intervention assessment and recommended services; and providing furniture and car seats for the children.

The court found that Teresa completed some services, but not all, noting she was suspended from visiting her children because she arrived late or not at all. Teresa also avoided treatment for her depression despite a hospitalization and suicidal ideation. As she told Dr. Stilwell, she opted instead to "self-medicate[] with alcohol in order to numb herself."

Although Thomas consistently attended supervised visits with Tommy in New Jersey, Thomas then moved to North Carolina. Afterwards, visitation was much less frequent. Thomas never completed ordered domestic violence programs, in New Jersey or North Carolina, although DCPP arranged for Thomas to complete services in both states. He also never obtained stable housing to accommodate his son.

The court also found, under prong three, that the Division "considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). The court noted that the Division considered placement with several of Thomas's and Teresa's family members and friends, but none were qualified before trial.

7

Notably, during trial, the Division was evaluating Teresa's grandparents as a possible placement for Tommy.[2]

Lastly, the court found, under prong four, that "termination of parental rights [would] not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). The court found there was "no realistic likelihood that" Teresa or Thomas would "be able to safely and appropriately care for their respective children now or in the foreseeable future." Teresa lacked stable housing or employment and had significant unaddressed mental health issues. The children did not have a strong bond with Teresa, but Andrew was firmly bonded to his resource parent. Thomas refused to attend a bonding evaluation. Thomas had no stable housing. Thomas had never lived with Tommy or been solely responsible for Tommy's care.

Therefore, the court concluded that neither Teresa nor Thomas was "able to provide [Andrew and Tommy] with a safe and stable home nor the permanency they so desperately need and deserve." In accord with Dr. Stilwell's opinion, the court found that Andrew's current placement and potential for adoption was his best hope for permanency.

---

[2] While the appeal was pending, the Division informed us that it approved Teresa's grandparents, Tommy was placed with them, and they are willing to adopt him.

II.

We exercise limited review of the trial court's decision. <u>In re Guardianship of J.N.H.</u>, 172 N.J. 440, 472 (2002). We defer to the trial court's fact-finding because of its "special expertise" in family matters and its "superior ability to gauge the credibility of the witnesses who testify before it[.]" <u>N.J. Div. of Youth & Fam. Servs. v. F.M.</u>, 211 N.J. 420, 448 (2012). We will not "second-guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence to support the decision to terminate parental rights." <u>Id.</u> at 448-49. We will not alter the trial court's findings absent a manifest denial of justice. <u>N.J. Div. of Youth & Fam. Servs. v. V.K.</u>, 236 N.J. Super. 243, 255 (App. Div. 1989). However, we review de novo the trial court's interpretation of the law and its legal conclusions. <u>N.J. Div. of Youth & Fam. Servs. v. R.G.</u>, 217 N.J. 527, 552 (2014).

Applying this standard, we reject Thomas's and Teresa's contention that the Division failed to prove the four prongs of the best interests test. We do so substantially for the reasons set forth in Judge Forrest's written opinion. We limit our comments to the procedural and evidentiary questions the parties raised.

Teresa contends she was deprived of a fair trial because she lacked counsel until the guardianship trial began, and because the trial court denied her adjournment request. We are unconvinced.

A.

Some background is necessary. At the first status conference after the Division filed its guardianship complaint, Teresa appeared telephonically and told the judge she hired private counsel, and gave his name, office address, and phone number.[3] The judge advised Teresa that her attorney needed to file a notice of appearance. Evidently, none was filed. At the next conference a month later, the judge was informed Teresa had refused to sign a 5-A form, but she did not say she wanted to represent herself. The judge discussed the importance of having counsel, and urged Teresa to fill out the form. By the end of the conference, Teresa said she would. The court announced the next status conference date on the record.

Then, Teresa did not appear at the next four status conferences. At the first one, the deputy attorney general reported that Teresa received the 5-A form,

---

[3] Judge Forrest did not preside over the various pre-trial hearings.

but did not complete it, instead expressing her intention "to talk to her private attorney." At the next three court sessions, the court tried unsuccessfully to reach Teresa by telephone while on the record. The court left messages about the court schedule and the need for her counsel to file an appearance.

On the day trial was scheduled to begin, January 29, 2020, Teresa appeared in court with a signed 5-A form. She said she was absent "[a] lot of times . . . because of work or I'm at visitation." The court determined that trial could not proceed that day.

In mid-February, Teresa appeared with her appointed counsel at a status conference before Judge Forrest. Counsel acknowledged receiving discovery. He requested and received eight days to prepare objections. He raised no other concern about his ability to prepare for trial.

After a brief discussion on the status of the Division's efforts to assess Teresa's grandparents as a possible placement, Thomas's attorney asked, "Can we adjourn the trial and then come back next month and pick new dates?"[4]

---

[4] Thomas's attorney had previously requested an adjournment in mid-January, to permit the Division to explore placement with certain members of Thomas's family. But, the court denied the request after noting that the Division had ruled out those family members; the children had been in placement since May 2017.

Counsel presented no argument in support of the request, which Judge Forrest denied. Teresa's attorney stated he would have asked the same question.

At another pre-trial conference later that month, both counsel appeared without their clients. The attorneys did not renew a request to adjourn, or state they were unprepared to proceed.

On the first day of trial before Judge Forrest, the deputy attorney general announced that Teresa's grandparents "were presumptively approved." She stated that the Division "hopefully" would move Tommy there in "the next couple weeks," or "up to a month." In the meantime, the Division would continue the licensing process. In response to the court's inquiry, the Division stated it opposed moving Andrew to his great-grandparents' home because he was bonded to his current resource parent, who had cared for him for over two years and was "fully committed to adoption." However, Andrew's great-grandparents were being assessed to take him, too, as a "backup plan."

Teresa's counsel requested an adjournment until Tommy was placed with his great-grandparents, "[b]ecause if the child is placed there . . . that might change our position about having the child." Thomas's counsel also asked for an adjournment, because Thomas might also be willing to engage in an identified

12

surrender of his parental rights to Teresa's grandparents.[5] Counsel also noted that Thomas would be entitled to three pre-surrender counseling sessions.

The Division opposed an adjournment. The Law Guardian did as well, noting that delay would disserve the children's interest in permanency, and that placement with their great-grandparents could be derailed by various developments, including a lack of licensing, an illness, or another placement.

Judge Forrest denied the request after confirming that the process to license the grandparents could take four to six months. He explained that the children's interests in permanency deserved priority. He stated the case had already been delayed, noting the case was almost three years old and the guardianship complaint was pending for almost a year. Judge Forrest said he understood that parents are interested in an identified surrender because it gives them some control over their children's future. But, "in fairness" to the parties and "in fairness more so to the children, there has to be finality."

_____

[5] Counsel was less than definitive about Thomas's intentions. On one hand, she indicated Thomas was only considering identified surrender, stating that Thomas was "interested in receiving presurrender counseling" and he "would be potentially amenable to doing an identified surrender." On the other hand, counsel indicated Thomas's intentions were more concrete, stating "we would ask for an adjournment of the trial . . . so that they can be licensed so he can perform the identified surrender to them."

After a break, discussions of identified surrender resumed. Teresa's counsel renewed his request for an adjournment, stating she would be willing to agree to an identified surrender of both boys, and only both boys, to her grandparents. Thomas's attorney reiterated that Thomas wanted pre-surrender counseling so he could "think about what his final position will be." The deputy attorney general reiterated the Division's opposition to moving Andrew to his great-grandparents' home at that time. The Law Guardian acknowledged the value of keeping the siblings together, but continued to object to adjourning the trial.

Judge Forrest concluded that trial would proceed, but the Division was obliged to provide the parties pre-surrender counseling.[6]

## B.

We first consider Teresa's argument about the lack of counsel. Teresa contends that "[a]lthough the judge repeatedly indicated on the record she was concerned by Teresa's lack of counsel, she failed to ascertain whether Teresa intended to represent herself and did not appoint standby counsel." Teresa relies

---

[6] At the close of the trial, Thomas's attorney returned to the subject of identified surrender, this time expressing Thomas's interest more definitively. She asked the court to "postpone judgment so that my client, he would like to do an identified surrender of [Tommy] to the maternal great-grandparents, he would like to have a say in where [Tommy] goes . . . ."

on New Jersey Division of Child Protection & Permanency v. A.O.J., 464 N.J. Super. 21, 23 (App. Div. 2020), in which we reversed a guardianship judgment entered after the trial judge conducted a brief trial at which the defendant was neither "present nor represented by counsel." Teresa also argues the trial court failed to assure that she wanted to proceed without an attorney as required by New Jersey Division of Child Protection & Permanency v R.L.M., 236 N.J. 123 (2018).

At the outset, we note that Teresa's trial counsel, once appointed, did not assert that Teresa was prejudiced by her lack of counsel, let alone seek any accommodations or adjustments to remedy any prejudice.[7] We are disinclined to address an issue not raised below, particularly where a well-founded request for relief could have been granted before proceeding to trial. See N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 339 (2010) (stating that "issues

---

[7] Teresa contends that had she been represented by counsel earlier, she would have been able to challenge the adequacy of the services she received and to take other steps to protect her interests. However, throughout the FN litigation, Teresa was represented by counsel who was in a position to advocate for her interests at that time. Also, Teresa does not argue that her appointed counsel in the guardianship matter was ineffective for failing to seek remedies for the alleged prejudice caused by the delayed appointment of counsel. See Fall & Romanowski, N.J. Family Law, Child Custody, Protection & Support § 13:8-2 cmt. c (2019) (noting that "[p]ursuant to R. 5:12-7, claims involving ineffective assistance of trial counsel must be raised on direct appeal of a proceeding initiated by DCPP") (citing DYFS v. B.R., 192 N.J. 301, 310-311 (2007)).

15

not raised below will ordinarily not be considered on appeal unless they are jurisdictional in nature or substantially implicate the public interest").

Furthermore, this case is nothing like A.O.J.  In that case, the mother "complained to the judge about her inability to communicate with her attorney 'for months,'" and then the judge allowed that same public defender to be relieved of counsel without filing a formal motion or notifying her client.  Id. at 23.  At that point, the mother was left with only two options: retain private counsel or proceed pro se.  But she could not afford to do the former.  And the trial court mistakenly inferred that A.O.J.'s complaints about her attorney constituted a waiver of her right to counsel.

Here, Teresa never asked the court for assistance in securing counsel.  The court acted reasonably, based on Teresa's statement under oath that she had obtained private counsel.  When the purported private attorney failed to file a notice of appearance, the court tried to get Teresa to sign the 5-A form to obtain appointed counsel.  The court reasonably relied on her statement, again under oath, that she would do so.  Then, Teresa simply absented herself from court proceedings until the day of trial.  Because Teresa never expressed an interest in representing herself, there was no reason for the court to engage in the

searching inquiry that her waiver of counsel was knowing, intelligent and voluntary, as required by R.L.M.

In sum, the delayed appointment of counsel did not deprive Teresa of a fair trial, because the delay was Teresa's own doing, and she failed to demonstrate she suffered any prejudice as a result of her delay in procuring counsel.

C.

We also reject Teresa's contention the court erred by declining to adjourn the trial. "A court may exercise broad discretion in controlling its calendar." State v. Kates, 426 N.J. Super. 32, 45 (App. Div. 2012), aff'd o.b., 216 N.J. 393 (2014). We review the trial court's decision on an adjournment request for an abuse of discretion. Escobar-Barrera v. Kissin, 464 N.J. Super. 224, 233 (App. Div. 2020). We consider "the amount of prejudice suffered by the aggrieved party" and will reverse only if the adjournment denial works an injustice. Ibid.

Furthermore, in guardianship cases, "[g]iven the impact of a trial delay or interruption on a child awaiting permanency, Family Part judges . . . must be mindful of the need for prompt determination of the difficult issues before them." R.L.M., 236 N.J. at 146-47. "[C]hildren have an essential and overriding interest in stability and permanency." In re Guardianship of J.C., 129 N.J. 1, 26

17

(1992).  Therefore, "it is inimical to their welfare that their legal status remain unresolved."  Ibid.

Applying these principles, we discern no error in the trial court's refusal to delay trial.  First, continued delay disserved the children's interest in stability and permanency.  Notably, to vindicate those interests, the statute requires the court to hold a guardianship trial within three months after the petition is filed.  N.J.S.A. 30:4C-15.2.  Judge Forrest was asked to adjourn a trial that was already scheduled to begin seven months beyond that deadline.

Second, an adjournment to permit the Division to complete the licensing process for Teresa's grandparents would not have obviated the need for a trial.  Teresa floated the idea of an identified surrender of both children to her grandparents.  But the Division and the Law Guardian opposed uprooting Andrew from his resource parent who wished to adopt him.  In addition, Thomas was unsure he would also agree to an identified surrender.  If he declined, there would still need to be a trial to resolve his parental rights to Tommy.  Finally, there also was no assurance that Teresa's grandparents would obtain licensing and Teresa would agree to an identified surrender.

Therefore, the court did not abuse its discretion by rejecting Teresa's adjournment request.

A-3321-19

IV.

Thomas contends the judgment should be set aside because the court relied solely on hearsay pertaining to the incidents of domestic violence and Thomas's participation or lack thereof in services and visitation.[8] Thomas complains that the trial record "is made up almost entirely of [Division] contact sheets and investigation reports, without medical records and service provider reports." Thomas cites to New Jersey Division of Youth and Family Services v. J.Y., 352 N.J. Super. 245 (App. Div. 2002), in which we criticized how a trial court conducted a fact-finding hearing in an abuse or neglect case. The trial court in that case wrongly relied on attorneys' factual representations outside their personal knowledge, heard from unsworn witnesses not subject to cross-examination, and relied on vague and unsupported stipulations of the parties.

No doubt, the court relied on hearsay that Thomas assaulted Teresa on multiple occasions. Teresa alleged that in one altercation over custody at Thomas's mother's house, Thomas struck Teresa while she held Tommy in her arms. In another incident at Thomas's mother's house, Thomas struck Teresa

---

[8] Thomas also complains that only hearsay supported the allegation that Teresa and Thomas failed to feed Tommy properly when he was an infant, resulting in Tommy's failure to thrive. But, because the trial court did not rely on these allegations in reaching its conclusions on the four prongs, we need not address them.

from behind and caused her to fall on and injure Andrew. Teresa also repeated her sister's allegation that she saw Thomas punch and strangle Andrew, leaving him with visible injuries that Division staff observed.

However, Teresa's allegations were not the only evidence of domestic violence. After the incident in which Teresa fell on Andrew, a caseworker observed Andrew's bruise. Thomas was arrested after that incident. Although Thomas disputed Teresa's version of events, he admitted a physical altercation, and said he "wanted to apologize" to Teresa but she rebuffed him. He denied he was a physically violent person, and "[h]e stated that he just needs anger management."

In a psychological evaluation, Thomas "admitted he and [Teresa] had physical fights." He admitted that when he got angry, "it's at a 10," but he asserted it took a lot to make him that way. He also admitted he was placed in special classes in school because of "anger and learning." But he insisted he did not need to participate in batterer's intervention because his behavior was not as bad as others'. The court also relied on hearsay in finding that Thomas never completed batterer's intervention; and his visitation became less frequent after he moved to North Carolina.

A-3321-19

We presume for argument's sake that some of that hearsay, such as Teresa's allegations, may have been subject to a well-founded objection.[9] However, "hearsay evidence not objected to is evidential." State v. Ingenito, 87 N.J. 204, 224 n.1 (1981) (Schreiber, J., concurring). "When objectionable hearsay is admitted in a bench trial without objection, we presume that the fact-finder appreciates the potential weakness of such proofs, and takes that into account in weighing the evidence." N.J. Div. of Child Prot. & Permanency v. J.D., 447 N.J. Super. 337, 349 (App. Div. 2018). A defense attorney may, as a strategic matter, decide that it is better to permit objectionable hearsay to come in, than to object and prompt the proponent to offer more compelling unobjectionable evidence. Ibid.

We are satisfied that the record evidence, even if some of it was subject to a well-founded objection that was not made, was sufficient to support the

---

[9] However, Teresa's statements that Thomas repeatedly committed acts of domestic violence against her conceivably could be characterized as statements against interest, as she admitted that she repeatedly exposed the children to those assaults. She obtained temporary restraining orders, then allowed the cases to be dismissed without securing protection against future assaults. To satisfy the hearsay exception, the Division would have had to persuade the court that Teresa's statements were "so far contrary to . . . [her] pecuniary, proprietary or social interest, or so far tended to subject [her] to civil . . . liability . . . that a reasonable person in . . . [her] position would not have made the statement unless . . . [she] believed it to be true." N.J.R.E. 803(c)(25).

court's findings that Thomas engaged in acts of domestic violence and refused to complete ordered batterer's intervention programming.

This court's reversal in J.Y. does not compel a similar result here. The trial in that case suffered from multiple failures to abide by the Rules of Court and the Rules of Evidence; a level of informality that fell short of the basic attributes of a fair trial. Nothing of the sort occurred here. Instead, this case presents the often-repeated scenario in which the Division offers its documentary file into evidence, and the defendant makes few if any objections, apparently preferring that mode of presentation.

In sum, the court did not deny Thomas a fair trial by considering hearsay that was admitted without objection.

V.

For the foregoing reasons, we affirm the judgment of guardianship and termination of parental rights.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION